# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KEYBANK NATIONAL ASSOCIATION, et al., | : | |
|     Plaintiffs, | : | |
| AND | : | |
| 1ST SOURCE BANK, | : | |
|     Intervenor Plaintiff, | : | Civ. No. 18-667 |
| v. | : | |
| FLEETWAY LEASING COMPANY, et al., | : | |
|     Defendants, | : | |
| AND | : | |
| SANTANDER BANK, | : | |
|     Intervenor Defendant. | : | |

| Diamond, J. | **M E M O R A N D U M** | August 23, 2019 |
|---|---|---|

William T. Hangley, acting as Receiver *pendente lite* for the Fleetway Entities, asks me to order Fleetway's secured creditors to disclose the legal fees and expenses they have incurred during this litigation. (Receiver's Mot., Doc. No. 275.) KeyBank has already provided the Receiver with this information. (Doc. No. 278.) Four of the creditors—Santander, TD Bank, PNC, and 1st Source—refuse to do so, objecting primarily on standing, attorney-client privilege, and relevance grounds. (Doc. Nos. 277, 279, 281, 283.) I will overrule the Banks' objections, but deny the Receiver's Motion without prejudice.

## I. BACKGROUND

On February 14, 2018, KeyBank filed a Complaint against Fleetway Leasing Company and FMC3, LLC (a related entity) seeking recovery of monies owed, the appointment of a receiver, and relief from the Fleetway Entities' fraudulent misrepresentations that induced KeyBank to extend credit. (Doc. No. 1.)

Two other banks to which Fleetway was indebted—Santander and 1st Source—were granted permission to intervene. (Doc. Nos. 7, 11, 18.) 1st Source subsequently filed its own Complaint against Fleetway, FMC2, Inc. (another Fleetway entity), and the Stampses (Fleetway's owners). (Doc. No. 21.)

In February and April 2018, Santander and KeyBank filed separate Confession of Judgment Complaints against the Stampses for amounts due under the guaranties that William, Carole, and Eric Stamps had pledged to the Banks in return for loans to the Fleetway Entities. (Compl., Doc. No. 1, Civ. No. 18-1303; Compl., Doc. No. 1, Civ. No. 18-1559; Compl., Doc. No. 1, Civ. No. 18-1560.) The Clerk of Court subsequently entered Judgment by Confession against the Stampses and in favor of Santander and KeyBank in amounts ranging from seven to ten million dollars. (Doc. No. 3, Civ. No. 18-1303; Doc. No. 8, Civ. No. 18-1559; Doc. No. 8, Civ. No. 18-1560.)

On February 15, 2018, KeyBank asked Judge McHugh (to whom this matter was then assigned) to appoint a receiver to take control of the Fleetway Entities because of financial distress and ongoing mismanagement of the vehicles that served as the Banks' collateral. (Doc. No. 3.)

On February 27, 2018, Judge McHugh held a hearing attended by Fleetway's secured creditors: KeyBank, Santander, TD Bank, PNC, and 1st Source. (See Feb. 27, 2018 Hr'g Tr., Doc. No. 24.) The creditors were concerned that the Stampses were self-dealing and misrepresenting Fleetway's finances. As KeyBank told Judge McHugh: "we've got a number of different banks here, with different interests, all at the same—or much of the same collateral that, clearly and admittedly, is not going to cover all of the outstanding debt." (Id. at 20.) KeyBank thus asked Judge McHugh to appoint a receiver: "somebody who's overarching, reporting to the Court, and also beholden to everybody, and not reporting up to the principals of the defendants." (Id. at 20–

21; see also id. at 33 ("[R]ight now, it's all within the control of Fleetway. And there isn't a great deal of confidence, even with [Fleetway's new manager].").) 1st Source was similarly concerned: "[T]here's $35 million that are owed, in the aggregate, to these secured lenders. And pats on the back and notions of, you know, we'll take care of you, simply won't suffice." (Id. at 37.)

Fleetway argued that a receiver was unnecessary because, "with the outside folks in place, who are running a much cleaner ship and much more effective ship," Fleetway was "in a much better position to maximize value." (Id. at 22.) Fleetway acknowledged, however, that questions remained respecting commingling and distributing funds, and that the main concern was "how do we keep this moving forward, so that everyone can get paid as much as possible." (Id. at 33–35.)

This assurance notwithstanding, the Banks continued to express their apprehension that Fleetway would favor one creditor over another. (See id. at 43 ("I was told that 1st Source was not going to be paid at the end of December, and I was told that Santander was not going to be paid at the end of December, but that PNC Bank and that TD Bank were going to be paid. And that turned out to be the case, we did not receive payment.").)

Santander objected to the appointment of a receiver, arguing that this would be an unnecessary expense on its collateral. (Id. at 36–38 ("[I]f a receiver was appointed for all the creditors, at this point, that's going to be on my client's back.").)

On March 9, 2018, Judge McHugh denied KeyBank's request for the appointment of a receiver, anticipating that with its new manager, Fleetway might work through its difficulties. (Doc. No. 19.)

On April 23, 2018, all the cases related to Fleetway and the Stampses' indebtedness were reassigned to me. (Doc. No. 41; Doc. No. 7, Civ. No. 18-1559; Doc. No. 7, Civ. No. 18-1560.)

On May 7, 2018, I consolidated the related cases before me in Civil Action Number 18-667. (Doc. No. 42.)

On May 15, 2018, I ordered the Parties to file weekly status reports regarding their ongoing global settlement discussions. (Doc. No. 54.) I also ordered the Stampses to file any Petitions to Strike or Open the confessed judgments against them by May 31, 2018. (Id.) The Stampses did so. (Doc. Nos. 66, 67; Doc. No. 6, Civ. No. 18-1303.)

On June 6, 2018, I scheduled a July 23, 2018 preliminary pre-trial conference with all the Parties. (Doc. No. 69.) On June 29, 2018, the Parties filed a Joint 26(f) Discovery Plan. (Joint 26(f) Report, Doc. No. 81.)

## II. THE RECEIVERSHIP

By late July, the situation was near-chaotic. (See July 23, 2018 Hr'g Tr. 3–5, Doc. No. 98; Receivership Order 2–3, Doc. No. 96.) The consolidated litigation encompassed some seventeen claims and cross-claims, with three Confessed Judgments totaling approximately eighteen million dollars, and five creditor-banks competing to recover dwindling assets. (July 23, 2018 Hr'g Tr. 3; Receivership Order 2–3.) The "global settlement discussions" showed little promise and no sign of resolution. (See July 23, 2018 Hr'g Tr. 23–35; Doc. Nos. 59, 60, 62, 64, 70, 75, 79, 80, 82–84.) Throughout, the Parties had propounded extensive, largely pointless discovery, ostensibly intended to ferret out assets (but, in fact, likely to generate only counsel fees). (See July 23, 2018 Hr'g Tr. 23; Receivership Order 2–3; Joint 26(f) Report.)

Accordingly, at the July 23 conference, I shared my concerns, stating that I did not "understand what Fleetway is doing with the money it's recovering and how it prioritizes whom it pays." (July 23, 2018 Hr'g Tr. 4.) I was concerned that the litigation cauldron created by the secured creditors would benefit only creditors' counsel. (See id. at 6 ("I just don't see how any of

4

this gets resolved with anybody making out except the people who bill hourly. . . . [I]t's the clients who are supposed to benefit here, and I don't see how they benefit from this ongoing blood bath.").)

Accordingly, I told the Parties that I was "giving extremely serious thought" to "staying everything, appointing a receiver, and seeing whether sanity can be restored to th[e] situation." (Id. at 4.) I informed the Parties that I "ha[d] no desire for Fleetway to go out of business," and that appointing a receiver would not be "a way of ending Fleetway's existence," but instead a way to manage the Parties' competing claims. (Id. at 13.) I thus indicated that if I appointed a receiver, he or she "would be someone who understands litigation and how to resolve it—not someone who understands how to lease cars." (Id. at 4.)

The secured creditors seemed to favor the appointment of a receiver. 1st Source's counsel stated, "I think the Court hit the nail on the head." (Id. at 9.) Co-counsel stated, "As you've outlined your thoughts, I think that is by far the best path forward." (Id. at 34.) 1st Source thus requested the appointment of a receiver. (Id. at 19.)

KeyBank also had "no objection to the appointment of a receiver." (Id.) Santander initially opposed the receiver's appointment. (Id. at 20.) After some discussion, however, Santander indicated it was "[l]ess" opposed to the appointment, and then stated that it "wouldn't oppose the initial appointment of a receiver." (Id. at 20, 22.)

Accordingly, accepting counsel's representations that none of the Banks was opposed, on July 31, 2018, I appointed William T. Hangley as Receiver *pendente lite* for the Fleetway Entities. (Receivership Order 2–3, 7.) I stayed all claims pending before me, including execution of the Confessed Judgments and the Stampses' Petitions to Strike, until Fleetway's finances improved under the Receiver. (Id.)

5

Apparently forgetting its July 23, 2018 representations to me, on August 14, 2018, Santander filed an interlocutory appeal of my Receivership Order, challenging Mr. Hangley's appointment. (Doc. No. 100.) The Circuit denied Santander's request to stay the Receivership's continued operation. (See Order, KeyBank Nat'l Ass'n v. Fleetway, No. 18-2822 (3d Cir. Sept. 13, 2018).). In its brief to the merits panel, Santander did not acknowledge its previous acquiescence in Mr. Hangley's appointment. Rather, it argued vigorously, *inter alia*, that it would be less expensive for Santander to recover from the Fleetway Estate without a receiver's assistance. (Appellant's Br. 20–22, 34, KeyBank Nat'l Ass'n, No. 18-2822 (3d Cir. Sept. 12, 2018) ("The appointment will harm Santander, whose potential loss will be increased if only by the fees and expenses of the receivership that it otherwise could avoid.").)

On July 24, 2019, the Third Circuit remanded the case to me for further proceedings, with instructions either to re-appoint Mr. Hangley or take any other action I deemed appropriate. KeyBank Nat'l Ass'n v. Fleetway Leasing Co., No. 18-2822, 2019 WL 3318214 (3d Cir. July 24, 2019). If I did not re-appoint Mr. Hangley, the Receivership would end as of October 22, 2019. Id.

On July 29, 2019, I ordered all interested Parties to state whether they objected to Mr. Hangley's continued service as Receiver. (Doc. No. 248.) 1st Source, KeyBank, and TD Bank agreed that the Receivership was appropriate, although they were concerned about costs. (Doc. Nos. 254, 255, 259.) Santander, PNC Bank, and the Stampses challenged the need for a Receiver, disputing that the Receivership had benefitted the Parties, given its cost. (Doc. Nos. 252, 256, 258.) Finally, Hyperion (recently in this litigation as an interested party only because it holds security interests in William Stamps' assets—not as Fleetway's creditor), took no position. (Doc. No. 257.)

In light of the Banks' cost-efficiency objections, on August 2, 2019, the Receiver asked each Bank to produce an accounting of its counsels' fees to date. (Receiver's Aug. 2, 2019 Letter, Ex. A to Doc. No. 275.) Only one Bank objected; the others simply did not respond to the request. (See Receiver's Mot. 1.)

Accordingly, on August 12, 2019, the Receiver moved for the production of the requested information. (Id.) I ordered all interested Parties to respond. (Doc. No. 276.) KeyBank subsequently complied with the Receiver's request for fee information. (Doc. No. 278.) TD Bank, PNC, 1st Source, and Santander all object and urge me to deny the Motion. (Doc. Nos. 277, 279, 281, 283.) Hyperion asks me to exclude it from any relief I might grant. (Doc. No. 280.) The Stampses seek copies of any fee data that is disclosed. (Doc. No. 282.)

### III. DISCUSSION

To assist me in evaluating the Banks' contentions respecting the Receivership's cost, Mr. Hangley asks me to order each Bank to produce an accounting of all counsel fees and expenses incurred: (1) from the beginning of this litigation until the Receiver's appointment; (2) from the Receiver's appointment to the present; (3) as a result of Santander's opposition to the Receiver's appointment; and (4) attempting to enforce the Stampses' guarantees. (Receiver's Mot. 1; Receiver's Aug. 2, 2019 Letter.) As requested, these disclosures would include only amounts expended.

Santander, PNC, and TD Bank object to the request primarily on attorney-client privilege and relevance grounds. (Santander's Objs., Doc. No. 277; PNC's Objs., Doc. No. 279; TD Bank's Objs., Doc. No. 281.) Santander also argues that the Receiver lacks standing to seek discovery. (Santander's Objs. 2, Doc. No. 277.) The objections are meritless.

7

### A. Standing

The Receiver's "role, and the district court's purpose in the appointment, is to safeguard the disputed assets, administer the property as suitable, and to assist the district court in achieving a final, equitable distribution of the assets if necessary." Liberte Capital Grp., LLC v. Capwill, 462 F.3d 543, 551 (6th Cir. 2006) (citing 13 Moore's Federal Practice ¶¶ 66.02–.03 (3d ed. 1999)). Accordingly, the Receiver acts as "an officer of the court," and his "powers are coextensive with his order of appointment." (Id.) In my July 31, 2018 Order, I gave the Receiver "all of the rights, duties, and responsibilities of a court-appointed receiver," including, *inter alia*, the power to "prosecute and defend claims . . . and suits in the name of, and for and on behalf of, the Fleetway entities, whether civil, criminal, administrative, or otherwise, with respect to the Receivership Assets." (Receivership Order ¶ 7(m).)

The Receiver thus certainly has standing to seek information relevant to my decision as to whether the Receivership should continue. See, e.g., S.E.C. v. Loving Spirit Found. Inc., 392 F.3d 486, 490 (D.C. Cir. 2004) ("[R]eceiver did not even need Article III standing" when filing motion that "was fulfilling her obligation to protect and preserve the receivership estate"). Indeed, the Third Circuit has already rejected Santander's objection to the Receiver acting as a party when Mr. Hangley defended the Receivership on appeal. (See Order, KeyBank Nat'l Ass'n, No. 18-2822 (3d Cir. Sept. 13, 2018).) Santander's reprised objection remains baseless.

### B. Attorney-Client Privilege

Similarly meritless is the Banks' contention that counsel fee information is privileged. "The attorney-client privilege does not shield fee arrangements." Montgomery Cty. v. MicroVote Corp., 175 F.3d 296, 304 (3d Cir. 1999) (citing In re Grand Jury Investigation, 631 F.2d 17, 19 (3d Cir. 1980)). Accordingly, privilege "is not a basis for counsel's refusal to share fee information

8

so long as nothing is revealed about the services performed." Hayes v. Am. Int'l Grp., No. 09-2874, 2013 WL 2414005, at *3 (E.D. Pa. June 4, 2013). Billing records are subject to the privilege only "to the extent that they reveal litigation strategy and/or the nature of services performed." Fidelity & Deposit Co. of Maryland v. McCulloch, 168 F.R.D. 516, 523 (E.D. Pa. 1996) (quoting United States v. Keystone Sanitation Co., 885 F. Supp. 672, 675 (M.D. Pa. 1994)); see also Keystone Sanitation, 885 F. Supp. at 675 ("[S]tatements and records that simply reveal the amount of time spent, the amount billed, and the type of fee arrangement between attorney and client are fully subject to discovery.").

Here, the Receiver seeks only an accounting of costs incurred, not a detailed description of what work was performed and why. (Receiver's Mot.; Receiver's Reply 6–7, Doc. No. 291 ("[I]t would be sufficient if the lenders were to provide, for each of the categories identified, the monthly amount of legal fees and costs their clients incurred and paid.").) Accordingly, this information is discoverable. Any lingering privilege concerns can be addressed through redactions and similar measures. See, e.g., Leach v. Quality Health Servs., 162 F.R.D. 499, 501–02 (E.D. Pa. 1995) (where counsels' billing invoices contain "description[s] of the actual legal services performed," then *only* that "information would generally be protected under the attorney-client privilege and should be redacted before production"). I will thus overrule the Banks' privilege objection.

C. Relevance

Despite insisting that the Receiver's fees have unduly burdened their collateral, the Banks contend that I may not learn how much each of the five Banks (each represented by its own counsel) would have spent without the benefit of a Receiver. (Santander's Objs. 2; PNC's Objs. 1–2; TD Bank's Objs. 2.) To state the contention is to refute it.

In determining whether I should re-appoint the Receiver, I consider:

> whether 'milder measures will give the plaintiff . . . adequate protection for his rights'; whether 'legal remedies . . . appear to be inadequate'; whether there continued to be 'fraud or imminent danger of the property being lost, injured, diminished in value, or squandered'; or whether there had been 'a showing that the harm accruing to plaintiff by denial clearly overbalanced the harm to defendant upon granting the appointment.'

KeyBank Nat'l Ass'n, 2019 WL 3318214, at *3 (quoting Maxwell v. Enter. Wall Paper Mfg. Co., 131 F.2d 400, 403 (3d Cir. 1942); Mintzer v. Arthur L. Wright & Co., 263 F.2d 823, 825–26 (3d Cir. 1959) (internal citation omitted)). Critical to my re-appointment decision is whether the Receivership benefits the Fleetway Estate. Accordingly, whether Mr. Hangley's recovery efforts are more cost-effective than the Banks tearing at each other in pursuit of the same collateral is central: the Banks have made it so. Indeed, for over a year, Santander—often generating more heat than light—has argued (including before the Third Circuit) that the Receivership is not cost-efficient: that Santander would save money by competing with the other Banks to recover collateral that all Parties agree cannot cover Fleetway's secured debt. (See Receiver's Reply 4 n.2 ("I mean we are going to suffer a larger loss because that receiver was appointed than if the receiver had not been appointed.").) To determine if this is correct, the Receiver seeks to compare what the Banks had paid their lawyers to make any recovery, what the Banks have paid resisting the Receivership, and what the Banks would likely pay absent the Receivership. It is, thus, disingenuous (to put it kindly) for the Banks to argue that such an "apples to apples" comparison is "irrelevant" and impermissible.

The law is well settled that the refusal to provide relevant, probative evidence—like the fee information sought here—can give rise to an adverse inference against the withholding party. See Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 335 (3d Cir. 1995) ("When the contents of a document are relevant to an issue in a case, the trier of fact generally may receive the fact of the document's nonproduction or destruction as evidence that the party that has prevented

10

production did so out of the well-founded fear that the contents would harm him."); Ogin v. Ahmed, 563 F. Supp. 2d 539, 543 (M.D. Pa. 2008) (Adverse inference may apply when following factors are satisfied: "1) the evidence in question must be within the party's control; 2) it must appear that there has been actual suppression or withholding of the evidence; 3) the evidence destroyed or withheld was relevant to claims or defenses; and 4) it was reasonably foreseeable that the evidence would later be discoverable." (citations omitted)).

With this Memorandum, I will issue a schedule for the Parties to set out in detail (and with legal support) their positions respecting Mr. Hangley's continued appointment. Should any Bank again raise the cost-efficiency objection without providing evidentiary support in the form of the fee information that has been requested, I will either order the data's disclosure or simply infer that Mr. Hangley has saved that Bank money. Until then, I will deny the Receiver's Motion without prejudice.

## IV. CONCLUSION

In the circumstances presented, the Receiver may permissibly seek and obtain the Banks' fee data, which is relevant and probative as to whether I should re-appoint Mr. Hangley. Concerns respecting the disclosure of privileged information have no basis. I will also overrule the Banks' remaining objections, which do not require further discussion. As I have explained, I will, for the present, defer my decision on the Receiver's request for fee information.

An appropriate Order follows.

August 23, 2019               **AND IT IS SO ORDERED.**

*/s/ Paul S. Diamond*
_____
Paul S. Diamond, J.