**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KEYBANK NATIONAL** | : | |
| **ASSOCIATION, et al.,** | : | |
| **Plaintiffs,** | : | |
| **AND** | : | |
| **1ST SOURCE BANK,** | : | |
| **Intervenor Plaintiff,** | : | **Civ. No. 18-667** |
| **v.** | : | |
| **FLEETWAY LEASING COMPANY,** | : | |
| **et al.,** | : | |
| **Defendants,** | : | |
| **AND** | : | |
| **SANTANDER BANK,** | : | |
| **Intervenor Defendant.** | : | |

| | | |
|---|---|---|
| **Diamond, J.** | **M E M O R A N D U M** | **October 11, 2019** |

The Third Circuit has remanded this matter so that I may determine whether again to appoint William T. Hangley as Receiver *pendente lite* or let Mr. Hangley's existing appointment expire. (See Order, <u>KeyBank Nat'l Ass'n v. Fleetway</u>, No. 18-2822 (3d Cir. Sept. 13, 2018).) One creditor makes baseless, ill-considered objections, which I will overrule.

## I. PROCEDURAL HISTORY

On February 14, 2018, Secured Creditor KeyBank filed a Complaint against Fleetway Leasing Company and FMC3, LLC (a related entity), alleging malfeasance by the Stamps family (Fleetway's owners), and seeking recovery of monies owed, appointment of a receiver, and relief from the Fleetway Entities' fraudulent misrepresentations that induced KeyBank to extend credit. (Doc. No. 1.) Contractually, KeyBank had the "right to have a receiver appointed" if Fleetway defaulted on its credit agreements. (Commercial Security Agreement, Ex. E to Amended Complaint, Doc. No. 32-1.)

Two additional creditor banks—Santander and 1st Source—subsequently intervened. (Doc. Nos. 7, 11, 18.) 1st Source then filed its own Complaint against Fleetway, FMC2, Inc. (another Fleetway entity), and William, Carole, and Eric Stamps. (Doc. No. 21.)

In February and April 2018, Santander and KeyBank filed separate Confession of Judgment Complaints against the Stampses for amounts due under the guaranties that William, Carole, and Eric Stamps had given in connection with loans to the Fleetway Entities. (Compl., Doc. No. 1, Civ. No. 18-1303; Compl., Doc. No. 1, Civ. No. 18-1559; Compl., Doc. No. 1, Civ. No. 18-1560.) Judgments by Confession were subsequently entered against the Stampses in amounts ranging from $7 to $10 million. (Doc. No. 3, Civ. No. 18-1303; Doc. No. 8, Civ. No. 18-1559; Doc. No. 8, Civ. No. 18-1560.)

On February 15, 2018, KeyBank asked Judge McHugh (to whom this matter was then assigned) to appoint a receiver. (See Motion for Appointment of Receiver, Doc. No. 3.) In addition to Fleetway's default, KeyBank noted the company's financial distress and alleged ongoing mismanagement of the vehicles that served as the Banks' collateral. (Doc. No. 3.)

On February 27, 2018, Judge McHugh held a hearing attended by Fleetway's Secured Creditors: KeyBank, Santander, TD Bank, PNC, and 1st Source. (See Feb. 27, 2018 Hr'g Tr., Doc. No. 24.) The Banks alleged that the Stampses were self-dealing, misrepresenting Fleetway's finances, and paying "favored" unsecured creditors over the Banks, which were contractually entitled to be paid first. KeyBank told Judge McHugh: "we've got a number of different banks here, with different interests, all at the same—or much of the same collateral that, clearly and admittedly, is not going to cover all of the outstanding debt." (Id. at 20.) KeyBank thus asked Judge McHugh to appoint a receiver: "somebody who's overarching, reporting to the Court, and also beholden to everybody, and not reporting up to the principals of the defendants." (Id. at 20–21.) 1st Source was similarly concerned: "[T]here's $35 million that are owed, in the aggregate, to these secured lenders. And pats on the back and notions of, you know, we'll take care of you, simply won't suffice." (Id. at 37.)

Fleetway responded that it had hired a new manager: "with the outside folks in place, who are running a much cleaner ship and much more effective ship," Fleetway was "in a much better position to maximize value." (Id. at 22.) Fleetway nonetheless acknowledged that questions remained respecting commingling and distributing funds, and that the main concern was "how do we keep this moving forward, so that everyone can get paid as much as possible." (Id. at 33–35.)

This assurance notwithstanding, the Banks feared that Fleetway would continue to favor one creditor over another. (See id. at 43 ("I was told that 1st Source was not going to be paid at the end of December, and I was told that Santander was not going to be paid at the end of December, but that PNC and that TD were going to be paid. And that turned out to be the case, we did not receive payment.").)

Alone among the Secured Creditors, Santander objected to the appointment of a receiver, arguing that this would be an unnecessary expense on its collateral. (Id. at 36–38 ("[I]f a receiver was appointed for all the creditors, at this point, that's going to be on my client's back.").)

On March 9, 2018, Judge McHugh denied KeyBank's request for the appointment of a receiver without prejudice, accepting Fleetway's contention that with its new manager, the Company might work through its difficulties. (Doc. No. 19.)

On April 23, 2018, all the cases related to Fleetway and the Stampses' indebtedness were reassigned to me. (Doc. No. 41; Doc. No. 7, Civ. No. 18-1559; Doc. No. 7, Civ. No. 18-1560.) On May 7, 2018, I consolidated the related cases before me. (Doc. No. 42.)

On May 15, 2018, I ordered the Parties to file weekly status reports regarding their ongoing global settlement discussions. (Doc. No. 54.) I scheduled a July 23, 2018 preliminary pre-trial conference with all the Parties. (Doc. No. 69.)

***The Decision to Appoint a Receiver***

Unfortunately, Fleetway's prediction of great improvements was grossly inaccurate: by late July, the situation was near-chaotic. (See July 23, 2018 Hr'g Tr. 3–5, Doc. No. 98; Receivership Order 2–3, Doc. No. 96.) The consolidated litigation comprised some seventeen claims and cross-claims, with three Confessed Judgments totaling approximately $18 million, and five creditor-banks competing to recover dwindling assets. (July 23, 2018 Hr'g Tr. 3; Receivership Order 2–3.) In proceeding separately against the same delinquent customers, the Banks made it inevitable that one Bank could recover only to the detriment of another. The "global settlement discussions" showed little promise and no sign of resolution. (See July 23, 2018 Hr'g Tr. 23–35; Doc. Nos. 59, 60, 62, 64, 70, 75, 79, 80, 82–84.) Throughout, the Parties had propounded extensive, redundant discovery, ostensibly intended to ferret out assets (but, in fact, likely to generate only counsel fees). (See July 23, 2018 Hr'g Tr. 23; Receivership Order 2–3; Joint 26(f) Report.)

Accordingly, at the July 23 conference, I shared my concerns, stating that I did not "understand what Fleetway is doing with the money it's recovering and how it prioritizes whom it pays." (July 23, 2018 Hr'g Tr. 4.) I was concerned that the litigation cauldron created by the Secured Creditors would benefit only creditors' counsel. (See id. at 6 ("I just don't see how any of this gets resolved with anybody making out except the people who bill hourly. . . . [I]t's the clients who are supposed to benefit here, and I don't see how they benefit from this ongoing blood bath.").)

Accordingly, I told the Parties that I was "giving extremely serious thought" to "staying everything, appointing a receiver, and seeing whether sanity can be restored to th[e] situation." (Id. at 4.) I informed the Parties that I "ha[d] no desire for Fleetway to go out of business," and that appointing a receiver would not be "a way of ending Fleetway's existence," but a way to manage the Banks' competing claims. (Id. at 13.) I thus indicated that if I were to appoint a

receiver, he or she "would be someone who understands litigation and how to resolve it—not someone who understands how to lease cars." (<u>Id.</u> at 4.) I stressed that "I w[ould] hear all objections." (<u>Id.</u> at 13.)

The Banks seemed to favor my proposal. 1st Source's counsel stated, "I think the Court hit the nail on the head." (<u>Id.</u> at 9.) Co-counsel stated, "As you've outlined your thoughts, I think that is by far the best path forward." (<u>Id.</u> at 34.) 1st Source thus requested the appointment of a receiver. (<u>Id.</u> at 19.) KeyBank, of course, also had "no objection to the appointment of a receiver." (<u>Id.</u>)

Santander initially opposed the Receiver's appointment. (<u>Id.</u> at 20.) After some discussion, however, its counsel indicated that the Bank was "[l]ess" opposed to the appointment, and then stated that the Bank "wouldn't oppose the initial appointment of a receiver." (<u>Id.</u> at 20, 22.)

Given this consensus, later that day, I proposed "staying [the litigation] and appointing William Hangley" as receiver. (Doc. No. 86, at 2.) Mr. Hangley is a vastly experienced, accomplished lawyer and litigator. I outlined the Receiver's anticipated powers, instructed Mr. Hangley to "file an affidavit disclosing whether there is any reason he may be disqualified from acting as Receiver," and again gave the Parties opportunity to object to his appointment. (<u>Id.</u> at 12.) To my surprise, only Santander—contradicting its July 23 statement—objected to the appointment of any receiver. (Doc. No. 90.) Santander stated that it "does not object to the appointment of William Hangley as receiver if a receiver is to be appointed," and did not question Mr. Hangley's qualifications. (<u>Id.</u> at 2.) Similarly, Santander did not object to the appointment of a receiver for the benefit of 1st Source and KeyBank. Rather, Santander favored the foreclosure provisions of its loan agreements with Fleetway, stressed "its preference to control its collateral," and sought to be excluded from the Receivership. (<u>Id.</u> at 12.) KeyBank responded that such exclusion from the proposed receivership was not feasible because "Santander's collateral [was]

intermingled with the collateral of other parties"; the Receiver's efforts would inevitably benefit all Secured Creditors. (Doc. No. 91-1, at 5.) Santander did not reply.

After considering the sole objection and the Parties' submissions, on July 31, 2018, I appointed William T. Hangley as Receiver *pendente lite* for the Fleetway Entities. (Receivership Order 2–3, 7.) I stayed all claims pending before me, including execution of the Confessed Judgments and the Stampses' Petitions to Strike, until Fleetway's finances improved under the Receiver. (Id.)

### *Third Circuit Review*

On August 14, 2018, Santander filed an interlocutory appeal of my Receivership Order, challenging Mr. Hangley's appointment. (Doc. No. 100.) The Circuit Court denied Santander's "Expedited Motions" to stay the Receivership's continued operation and to disqualify the receiver from defending the appeal. (See Order, KeyBank Nat'l Ass'n v. Fleetway, No. 18-2822 (3d Cir. Sept. 13, 2018).) In its merits briefing and argument, Santander never acknowledged its July 23 statement that it "would not oppose in the initial appointment of a receiver," or its acceptance of Mr. Hangley's qualifications. (See July 23, 2018 Hr'g Tr., at 22.) Rather, the Bank argued for the first time that the appointment violated Santander's due process rights, and that it would be less expensive for Santander to recover from the Fleetway Estate without a receiver's assistance. (Appellant's Br. 20–22, 34, KeyBank Nat'l Ass'n, No. 18-2822 (3d Cir. Sept. 12, 2018).)

On July 24, 2019, the Third Circuit ruled that Santander had waived its due process claim and remanded the case to me for further proceedings, with instructions either to reappoint Mr. Hangley with a statement of reasons for the reappointment or take any other action I deemed appropriate. KeyBank Nat'l Ass'n v. Fleetway Leasing Co., No. 18-2822, 2019 WL 3318214 (3d Cir. July 24, 2019). If I did not reappoint Mr. Hangley, the Receivership would end as of October 22, 2019. Id.

### Proceedings on Remand

On July 29, 2019, I ordered all interested Parties to state whether they objected to Mr. Hangley's continued service as Receiver. (Doc. No. 248.) 1st Source, KeyBank, and TD agreed that the Receivership was appropriate, although they were concerned about costs. (Doc. Nos. 254, 255, 259.) Santander, PNC, and the Stampses questioned the Receivership's benefits, given its cost. (Doc. Nos. 252, 256, 258.)

In light of the Banks' cost-efficiency objections, on August 2, 2019, the Receiver asked each Bank to produce legal expense data that would reveal, *inter alia*, each Bank's asset recovery costs before Mr. Hangley's appointment, their likely costs if Mr. Hangley not been appointed, and costs incurred resisting the Receivership. (Receiver's Aug. 2, 2019 Letter, Ex. A to Doc. No. 275.) Only one Bank objected; the others simply did not respond to the request. (See Receiver's Mot. 1.)

Accordingly, on August 12, 2019, the Receiver moved for the production of the requested information. (Id.) I ordered all interested Parties to respond. (Doc. No. 276.) KeyBank subsequently complied with the Receiver's request for fee information. (Doc. No. 278.) TD, PNC, 1st Source, and Santander all objected and urged me to deny the Motion. (Doc. Nos. 277, 279, 281, 283.)

On August 23, 2019, I ruled that in light of the Banks' cost-efficiency objections, the Receiver was entitled to determine whether, absent his appointment, the Banks would have paid greater amounts in counsel fees for smaller recoveries. I nonetheless denied without prejudice the Receiver's request for counsel fee information, noting that if any Bank renewed its cost-efficiency objection to Mr. Hangley's reappointment, I would "either order the data's disclosure or simply infer that Mr. Hangley had saved that Bank money." (Doc. No. 295, at 11.)

On September 6, 2019, pursuant to my Order, the Banks, the Stampses, and the Receiver submitted legal memoranda addressing the Receiver's continued appointment. (Doc. Nos. 301–02, 304–07.) They filed responsive memoranda on September 17, 2019. (Docs. No. 310–12.)

Four of the five Banks withdrew their cost-efficiency arguments, stating that they had no objection to Mr. Hangley's reappointment. 1st Source and KeyBank lauded the Receiver for restoring order to the chaotic situation he had inherited, and urged me to reappoint him. (See Doc. No. 306, at 2–3; Doc. No. 303, at 1.) The four suggested that I anticipate when the Receivership would likely conclude, limit the Receiver's retention amount, and direct him to issue reports quarterly (rather than monthly). Santander heatedly objected to Mr. Hangley's reappointment because it would "impair[] the value of [Santander's] collateral." (Doc. No. 306, at 16.) The Stampses also objected to Mr. Hangley's reappointment, insisting (without a trace of irony) that Mr. Hangley had so successfully liquidated Fleetway's assets that he was no longer needed. (See Doc. No. 305, at 6 ("[W]ith the bulk of the Fleetway fleet addressed, the continued expense of the receivership is unnecessary and wasteful . . . .").)

On September 19, 2019, I ordered the Parties to inform me if any sought an evidentiary hearing concerning Mr. Hangley's reappointment and provide "a list of witnesses it would call and summaries of each witness's expected testimony." (Doc. No. 313.) KeyBank responded that no hearing was necessary because the Receiver's submissions "contain information and evidence" more than sufficient to warrant Mr. Hangley's reappointment. (Doc. No. 316, at 2.) Santander argued that because it had intervened in this litigation as a defendant, and because it opposed the Receiver's renewed appointment, it was not obligated to comply with my Order. It thus declined to identify the witnesses it would actually call or the substance of their anticipated testimony. Santander also stated that, if not called by any other Party, Santander intended to call Mr. Hangley and his lawyer, Matthew Hamermesh, as adverse witnesses. The Bank suggested that in arguing

for the Receiver's renewed appointment, Messrs. Hangley and Hamermesh had effectively become counsel for KeyBank and 1st Source.  (Id. at 8–9.)  Based on this suggestion, Santander also moved to disqualify Messrs. Hangley and Hamermesh because they could not be witnesses and "also be counsel and advocates for either KeyBank or 1st Source Bank or for Mr. Hangley's appointment or reappointment as receiver."  (Doc. No. 315, at 2.)  In an earlier Order (Doc. No. 326), I denied both Santander's apparent request for an evidentiary hearing and its ludicrous Disqualification Motion.  See SEC v. Chenery Corp., 332 U.S. 194, 215 (1947) (Jackson, J., dissenting) ("Now I realize fully what Mark Twain meant when he said, 'The more you explain it, the more I don't understand it.'").

## II.    RECORD

An order appointing a receiver need not rest on stated findings of fact.  See Fed. R. Civ. P. 52(a)(3) ("The court is not required to state findings or conclusions when ruling on a motion under Rule 12 or 56 or, unless these rules provide otherwise, on any other motion."); see United States v. Cedar-Riverside Land Co., 592 F.2d 470, 472 (8th Cir. 1979) ("[T]he district court did not err in failing to make findings of fact in its order appointing the receiver.").  In light of the Third Circuit remand and Santander's stated intention to appeal should I reappoint Mr. Hangley, however, I will make factual findings on which I base my reappointment decision.  (Doc. No. 312, at 20.)

I make these findings based on record documents (the authenticity of which is not disputed), including exhibits, declarations, hearing transcripts, and reports prepared by the Receiver. Frederick Cardone, the new manager who began consulting for Fleetway in December 2017 and stayed on to serve as Fleetway's chief financial officer during the Receivership, has submitted declarations addressing Fleetway's finances.  (See Declaration of Frederick Cardone, Doc. No. 307-1 ("Cardone Sept. Declaration"); Supplemental Declaration of Frederick Cardone, Doc. No.

310-1 ("Cardone Supplemental Declaration").)  Finally, pursuant to my Order, the Receiver has provided monthly reports detailing his activities and Fleetway's condition.  (See, e.g., First Report of William T. Hangley, Receiver *Pendente Lite* for Fleetway Leasing Company, Inc., FMC2, Inc, and FMC3, LLC, Doc. No. 121.)

No Party has offered evidence to contradict these documents, nor has any Party sought discovery.  Surprisingly, Santander argues that the declarations of Mr. Cardone—whose managerial efforts the Bank has applauded—purportedly do not "respect" the requirements of Rule 56.  See Fed. R. Civ. P. 56; (Doc. No. 312, at 3).  Yet, Mr. Cardone's "personal knowledge and information" declarations are exactly the kind commonly employed at summary judgment.  See, e.g. DiBacco v. Dep't of the Army, 926 F.3d 827, 833 (D.C. Cir. 2019); Beenick v. LeFebvre, 684 F. App'x 200, 206 (3d Cir. 2017); see also Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").  Moreover, Santander does not dispute the declarations' truth or accuracy.  In any event,  Santander ignores that I am not granting summary judgment; Rule 56 is inapposite here. See, e.g., 12 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure Civil § 2983 (3d ed. 2019) ("[T]he form and quantum of evidence required on a motion requesting the appointment of a receiver is a matter of judicial discretion.").

## III.    FINDINGS OF FACT

Before I appointed Mr. Hangley, the Stamps family's mismanagement and self-dealing had led Fleetway into failure.   Remarkably, even though the Stampses themselves do not seek to resume control of Fleetway, Santander seeks it for them.  (Doc. No. 312, at 19 ("Santander would favor a return of the Stampses to control of Fleetway rather than William Hangley.")  Yet, before Mr. Hangley's appointment, customers took advantage of the Company's distress, defaulting on

numerous leases. The Banks—fighting over the same, dwindling funds—were dissatisfied with their recoveries on secured debt. Under Mr. Hangley's direction, the situation has improved dramatically. The Receiver has recovered over $14 million and paid to the Banks some $11.4 million, reduced Fleetway's corresponding debt, pursued delinquent customers, and eliminated self-dealing payments to the Stampses. (Thirteenth Report of William T. Hangley, Receiver *Pendente Lite* for Fleetway Leasing Company, Inc., FMC2, Inc, and FMC3, LLC, Doc. No. 323, at 27 ("Receiver's Thirteenth Report").) The Receiver has also detailed his plans to provide the Banks with additional moneys and to wind down the Receivership.

### *The Stampses' Malfeasance*

Fleetway's principal business is "leasing fleets of vehicles to car rental agencies under long-term leasing arrangements." (Cardone Sept. Declaration, Doc. No. 307-1, ¶ 9.) These agencies in turn rent the vehicles to individual customers. (Id. ¶ 10.) Fleetway finances vehicle acquisitions by borrowing money from its commercial banking partners, including the five Banks that have been involved in this litigation. (See, e.g., Comp., Doc. No. 1, ¶ 15; Answer, Doc. No. 20, ¶ 15.) These loans are secured by the vehicles themselves and the stream of payments due to Fleetway under the corresponding leases. (Compl., Doc. No. 1, ¶ 17; Answer, Doc. No. 20, ¶ 17.) The "collateral" securing the loans—the leased vehicles—depreciates continually "as the vehicles age and are driven for additional miles." (Cardone Sept. Declaration, ¶ 11.) Fleetway tracks customer lease payments, and generates accounts receivables reports. These A/R Reports inform each Bank "whether the rental car agencies and other lessees were current or delinquent on their payments to Fleetway under their leases" attributable to a particular Bank's line of credit. (Cardone Sept. Declaration, ¶ 13.)

Unfortunately, the Stamps family abused this reporting system. They have admitted that they knowingly provided KeyBank with at least two A/R Reports that included false statements.

(Id. ¶ 20.)  Moreover, Fleetway's then–Controller, Matt Hoff, altered the status of eleven lessee accounts "from 'over 120' days overdue to 'other' at the instruction of [William] Stamps."  (Id. ¶ 21; see Ex. J to Complaint, Doc. No. 1-18; see also id. ¶¶ 14–17, 19–20.)  In addition, Fleetway's financial advisor, Strategic Capital Investments LLC, reported to KeyBank on January 3, 2018 that a batch of Fleetway's leases KeyBank had financed—including many marked as "current" on the June and September 2017 A/R Reports—were $1,200,000 in arrears.  (Cardone Sept. Declaration, ¶ 25.)  On January 26, 2018, Fleetway itself alerted Keybank to the misrepresentations in the A/R Reports.  (Id. ¶ 19.)  The Company explained that even though William Stamps knew the Reports untruthfully listed delinquent accounts as current, he nonetheless "instructed Fleetway staff to disregard those delinquencies when preparing the A/R Reports for Keybank."  (Id. ¶ 20.)  Relying on the Stampses' fraudulent statements, KeyBank had already "made over 150 extensions of credit to Fleetway."  (Id. ¶ 26.; see also KeyBank's Motion for Appointment of Receiver, Doc. No. 3, at 5–6.)

Fleetway also acknowledged that it "would be unable to repay KeyBank" over $4 million of debt and could not repay other creditors over $8.75 million.  (Id. ¶ 27.)  Admitting that it "was not well run" (surely, an understatement), the Company deemed some 80 vehicles as "missing," and was selling other vehicles at a loss.  When a lessee of some 600 vehicles defaulted, it was determined that cars with a book value over $300,000 had been wrecked, and that a large number of cars with a book value of almost $1 million had simply disappeared.  (First Report of William T. Hangley, Receiver *Pendente Lite* for Fleetway Leasing Company, Inc., FMC2, Inc, and FMC3, LLC, Doc. No. 121, at 17.)

Upon learning that they would not be repaid, some of the Banks took matters into their own hands, demanding that Fleetway's customers pay them directly or turn over vehicles. (Cardone Supplemental Declaration, ¶¶ 16–18.)  The resulting parallel obligations to the Banks and Fleetway

confused Fleetway's customers, often to the Banks' detriment. (See id. ¶ 15.) For example, TD demanded that a customer "turn over to it a fleet of 40 vehicles," even though "[t]he customer was current on its payments to Fleetway." (Id. ¶ 18.) TD recovered nothing. Santander also appears to have recovered nothing from Fleetway customers. (See, e.g., July 23, 2018 Hr'g Tr. 32 ("We haven't attempted to pick up cars, or anything."); see also id. at 21.)

Taking advantage of the confusion they had created, the Stampses commingled loan payments to the Banks' great detriment. (Feb, Doc. No. 24, at 4–5, 32.) Because each vehicle Fleetway leased corresponded to a single Bank's financing, only that lender Bank held a security interest in lease payments made on a given vehicle. Yet, under Stamps management, Fleetway disregarded acceptable accounting practices by depositing all lease payments into the same account, thus bleeding separate lines of credit together. (Feb. 27, 2018 Hr'g Tr., Doc. No. 24, at 4–5.) Having destroyed the ability to identify each Bank's separate security, Fleetway proceeded to pick and choose the creditors to be paid from the commingled pot, often favoring unsecured creditors over the Banks, whose collateral had generated the cash. (Feb. 27, 2018 Hr'g Tr.at 43 – 44, 47; see also Ex. B to Fleetway Response, Doc. No. 10; Supplemental Declaration of Frederick Cardone, Doc. No. 310-1, ¶ 19 ("Cardone Supplemental Declaration").)

Worse, after improperly combining lease payments, the Stampses then enriched themselves to the detriment of the Banks. (See Ex. 1 to Cardone Sept. Declaration.) In the year leading up to Mr. Hangley's appointment, Fleetway paid over $375,000 to members of the Stamps family and their lawyers. (Id.) In addition to this generous "compensation," the Company paid for the Stampses' personal expenditures, such as: the family's boating rental and fuel costs, air travel for William's granddaughter, Uber rides to take Eric Stamps's children to school, and William Stamps's lavish birthday party. (Ex. 1 to Cardone Sept. Declaration.) The Stampses continued

this malfeasance even *after* the instant action commenced and the Company was defaulting on debt to its Secured Creditors.  (Id.)

### Mr. Hangley's Efforts

Once again, since I appointed him on July 31, 2018, the Receiver has recovered more than $14 million and paid over $11 million to the Banks.  (Thirteenth Report of William T. Hangley, Receiver *Pendente Lite* for Fleetway Leasing Company, Inc., FMC2, Inc., and FMC3, LLC, Doc. No. 323, at 27 ("Receiver's Thirteenth Report).)  These distributions resulted directly from Mr. Hangley taking inventory of the Company's leased vehicles, collecting lease payments, auctioning vehicles, and processing lease payoffs.  (Id. at 22–23.)  While overseeing Fleetway's day-to-day operations, Mr. Hangley has also reduced Fleetway's vehicle portfolio by more than two-thirds through buy-outs and auctions.  (See Receiver's Twelfth Report, at 7, 11.)  The Receiver's sales have generated over $8 million in revenue.  (Id. at 6.)  He has collected over $3.6 million in lease payments, including more than $1.5 million in payments "from delinquent customers as to whom more aggressive collection efforts were made."  (Id. at 6.)  The Receiver has distributed the resulting proceeds as follows: $3,703,456 to KeyBank, $1,312,850 to PNC, $2,245,090 to Santander, $472,549 to 1st Source, and $1,222,384 to TD.  (Id. at 23–24.)  The Receiver has held back twenty-five percent ($2,991,204) of his recovery.  (Id.)  As of August 31, 2019, the Receivership has incurred $1,174,822.85 in fees and expenses.  This figure includes payments to other professionals hired to aid the Receiver.

Mr. Hangley recovered over $8.9 million in the Receivership's initial seven months, exceeding his initial projection by 29.4%. (Eleventh Report of William T. Hangley, Receiver *Pendente Lite* for Fleetway Leasing Company, Inc., FMC2, Inc., and FMC3, LLC, Doc. No. 243, at 23–24.)  His current total cash recovery of $14.8 million also exceeds projections. (See Receiver's Thirteenth Report, at 28.)  The Receiver has distributed funds to the Banks in an orderly,

disinterested fashion, and reduced Fleetway's operating expenses. (Id. at 7 ("As a result of the Receiver's efforts, the Receiver has reduced annualized employment expenses by $152,000, or 42%.").) He has ended questionable payments to the Stamps family. (Receiver's First Report, at 2.) The Receiver has initiated seven lawsuits to recover monies and vehicles from delinquent lessees. (See Hangley v. Verve Car Rental, LLC et al., No. 18-3460; Hangley v. Exec. Car Rental, Inc. et al., No. 19-1101; Hangley v. Total Access Med., LLC et al., No. 19-3769; Hangley v. Omni Collective, LLC et al., No. 19-3916; Hangley v. Doral Servs. Assoc. Corp. et al., No. 19-3917; Hangley v. Skyline Auto Source, Inc. et al., No. 19-3918; see also Receiver's Thirteenth Report, at 19–22.) This litigation has begun to bear fruit. Magistrate Judge Rice very recently settled Hangley v. Executive Car Rental for some $475,000 plus other benefits. Mr. Hangley has also resolved an insurance claim for $120,000. (Eighth Report of William T. Hangley, Receiver Pendente Lite for Fleetway Leasing Company, Inc., FMC2, Inc., and FMC3, LLC, Doc. No. 183, at 16–17.) The Receiver continues to evaluate litigation that could benefit Fleetway.

### Winding Down

Mr. Hangley has proposed a reasonable plan for the Receivership's final stages. (Receiver's Twelfth Report, at 26–27.) He intends to preserve value for the Banks by collecting on leases, repossessing and selling vehicles, pursuing insurance claims, and initiating collection actions against delinquent debtors. (Id. at 26.) The Receiver intends to prioritize his continuing efforts to pay down Fleetway's debt to the Banks.

If I declined to renew Mr. Hangley's appointment, however, Fleetway would return to the tender mercies of the Stamps family and their mismanagement. Indeed, Mr. Cardone, who has ably assisted the Receiver in overseeing Fleetway's day-to-day operations, has made clear that he will not serve as Fleetway's Receiver, nor would he continue to work for the Company if control were returned to the Stampses. (Cardone Supplemental Declaration, ¶¶ 6–8.) He has also averred

that if he found himself working for Fleetway without the benefit of a Receiver and his counsel (Mr. Hamermesh), "one of the first things [Mr. Cardone] would do is hire an attorney to advise [him]. Because of their extensive experience with Fleetway already, [he] would likely hire the Hangley firm." (Id. at ¶ 11.) Appointing a new Receiver—although none has been proposed— would be expensive and pointless, especially given that the Receivership will end in months.

## IV.    LEGAL STANDARDS

The decision to appoint a receiver is an equitable one available at my discretion. See Mintzer v. Arthur L. Wright & Co., 263 F.2d 823, 824 (3d Cir. 1959). In making the decision, I must consider:

> whether "milder measures will give the plaintiff . . . adequate protection for his rights"; whether "legal remedies . . . appear to be inadequate"; whether there continued to be "fraud or imminent danger of the property being lost, injured, diminished in value, or squandered"; or whether there had been "a showing that the harm accruing to plaintiff by denial clearly overbalanced the harm to defendant upon granting the appointment."

KeyBank Nat'l Ass'n, 2019 WL 3318214, at *3 (quoting Maxwell v. Enter. Wall Paper Mfg. Co., 131 F.2d 400, 403 (3d Cir. 1942); see Mintzer, 263 F.2d at 825–26 (internal citation omitted)). This list of considerations is not exhaustive, and no single factor is dispositive. See Can. Life Assur. Co. v. LaPeter, 563 F.3d 837, 844 (9th Cir. 2009) ("There is no precise formula for determining when a receiver may be appointed.") (internal quotation marks and citation omitted); see also KeyBank Nat'l Ass'n, 2019 WL 3318214, at *3 ("We do not require rote review of these principles or preclude consideration of others.").

## V.    DISCUSSION

The considerations set out by the Circuit Court weigh heavily in favor of Mr. Hangley's reappointment.

### A.    No "Milder Measures" Are Available

No Party has identified a viable, "milder" alternative to the Receivership.  Santander again suggests I appoint a Receiver that it will not pay for: he or she will thus administer only the collateral of the other Banks.  (See, e.g., Doc. No. 302, at 11–12.)  Santander offers no legal support for this unworkable suggestion, nor can I find any.  See, e.g. SEC v. Elliott, 953 F.2d 1560, 1565 (receiver takes possession of all the estate's assets).  Indeed, were I to adopt Santander's suggestion, the other Banks would certainly seek the same "remedy," thus returning Fleetway to disorder.  Moreover, as I have explained, in seeking to recover only its own collateral (assuming any still exists), Santander would be unscrambling an egg.  As KeyBank anticipated in requesting a receiver, any efforts to recover a tranche of vehicles cannot be surgically separated to benefit four of the Banks, but not the fifth.  Moreover, because the Stampses deposited monies into a common fund, there is no *cordon sanitaire* separating Santander's security from that of the other Banks.  Finally, even if the other Banks acquiesced in Santander's proposed arrangement, parallel efforts by a Receiver and Santander to recover vehicles from the same customers would be only somewhat less confusing than the situation that obtained before I appointed Mr. Hangley.  Santander's "partial" Receivership is thus hardly a "milder" or even viable measure.

The Stampses suggest that Mr. Cardone could run Fleetway without Mr. Hangley's supervision.  (Doc. No. 305, 2–3.)  Yet, Mr. Cardone refuses to serve as Receiver and will not manage Fleetway if it is returned to the Stampses' control— exactly what would occur if I did not reappoint Mr. Hangley.  Moreover, Fleetway's "significant insurance claims" may comprise its "single largest assets."  (Id. at 5.)  That is why, as I have noted, Mr. Cardone would "likely hire the Hangley firm" to pursue these claims and related litigation.  (Cardone Sept. Affidavit ¶ 11.)  The Stampses' "milder" alternative would thus create a distinction without a difference.

Appointing a Receiver was not this Court's first choice. Rather, Judge McHugh gave Fleetway ample opportunity to clean its own home. After some six months, it was obvious that Fleetway had failed miserably: by July 2018 there was no milder or viable alternative to a Receivership. No milder or viable alternative exists now.

### B.    The Banks' Legal Remedies Are Inadequate

When I appointed Mr. Hangley, the Banks had no satisfactory remedies available to them. All Parties, including Santander, acknowledged that Fleetway's existing collateral could not make its Secured Creditors whole. (See Doc. No. 312, at 11 n.8 ("Santander is undersecured and the value of its collateral is not equal to the debt it secures . . . .").) As I have described, Fleetway found itself at the center of a litigation morass involving some seventeen claims and cross-claims. Fleetway's debtors took advantage of this instability, refusing to pay the Company (thus making less money available for the Banks). The lawsuits and discovery the Banks then directed at each other underscores the lack of adequate legal remedies without a Receiver's strong, unified management.

My findings confirm that in the absence of a Receiver, the Banks would again have no satisfactory legal remedy. Plainly, the only alternative that could keep Fleetway afloat and maximize recovery to the Banks was and remains a Receivership.

### C.    In Mr. Hangley's Absence, the Stampses Would Have Squandered Fleetway's Assets

"It is well settled that proof of fraud is not required to support a district court's discretionary decision to appoint a receiver." Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc., 999 F.2d 314, 317 (8th Cir. 1993). Yet, "the probability that fraudulent conduct has occurred or will occur," as well as conduct that risks concealing, losing, or devaluing the estate's property, counsels in favor of appointing a receiver. Id. at 316.

As I have found, the Stampses treated Fleetway's assets as their own. They mismanaged the Company while falsely reporting to their lenders that all was well. They commingled funds and paid preferred creditors to the Banks' detriment. This malfeasance ended only because of the Receiver's efforts, including his direction that Fleetway's employees stop making payments to the Stampses. (Docs. No. 17, at 4 (KeyBank Reply), 10 at ex. B (Fleetway's response); <u>see</u> Receiver's First Report, Doc. No. 121, at 2.) Were William, Eric, and Carole to resume control of the Company, their unsavory practices would likely resume as well. That is undoubtedly why Mr. Cardone refuses to manage the Company were it returned to the Stamps family.

In these circumstances, the fraud and waste that occurred and will likely reoccur weigh heavily in favor of the Receiver's appointment.

### D. The Receivership Has Significantly Benefited All the Banks

To repeat, Mr. Hangley has recovered over $14 million and distributed to the Banks over $11 million. (Receiver's Thirteenth Report, at 27.) He has distributed over $2.2 million to Santander alone through vehicle sales and lease payments. (Receiver's Twelfth Report, at 18–19.) Mr. Hangley's expeditious recovery and disposal of Fleetway's vehicles and his collection from delinquent customers underscore his value to the Company and its creditors. He has sued Fleetway's largest debtors, already securing more than one favorable settlement. He has ended the Sampses' malfeasance and mismanagement and reduced the Company's operating expenses. He has reduced Fleetway's vehicle portfolio by over two-thirds. Not surprisingly, four of the five Banks have thus withdrawn the suggestion that the Receivership has not been cost-effective. (The fifth still makes the allegation, but refuses to produce any supporting evidence.)

These benefits will continue to accrue as the Receivership winds down. Most of Fleetway's leases will conclude by 2020, and the Receiver has laid out a sensible plan for liquidating Fleetway's inventory, pursuing its insurance claims, and otherwise maximizing recovery on

remaining leases while managing expenses—all to take place by March of 2020. (Receiver's Twelfth Report, at 26–27.)

In these circumstances, the benefits the Receivership has conferred and will confer weigh strongly in favor of reappointing Mr. Hangley.

### E.     The Receiver's Powers

Pursuant to my equitable authority, I will reappoint Mr. Hangley to serve  as Receiver *pendente lite* of Fleetway.  In reappointing Mr. Hangley, I note that he has accepted suggestions made by KeyBank, 1st Source, TD, and PNC: he anticipates that the Receivership will remain in place for less than six months, and agrees to issue reports only every quarter. (Doc. No. 310, at 18 n.12.)

In the circumstances presented, I will again authorize Mr. Hangley to sell assets "free and clear of liens, claims, interests, and encumbrances," and charge Receivership expenses against the Banks that benefit from its efforts, including Santander.  (Receivership Order, Doc. No. 86, at 6.)

***The Receiver May Sell Receivership Assets Free and Clear of All Liens***

Because the Third Circuit expressed interest in this aspect of the Receiver's authority, I will address it further.  <u>See</u> <u>KeyBank Nat'l Ass'n</u>, 2019 WL 3318214, at *3.

A central "purpose of equity receiverships is to promote orderly and efficient administration of the estate by the district court for the benefit of creditors." <u>SEC v. Hardy</u>, 803 F.2d 1034, 1038 (9th Cir. 1986).  Given this animating principle and the disorder that often gives rise to receiverships, the court's supervisory discretion is "extremely broad," allowing the receiver powers necessary to restore constancy and maximize asset recovery.  <u>Id.</u>

The Third Circuit has long held that a court sitting in equity may authorize a receiver to sell estate assets free and clear of liens and other claims.  <u>See</u> <u>People's-Pittsburgh Tr. Co. v. Hirsch</u>, 65 F.2d 972, 972 (3d Cir. 1933) ("A court of equity, under proper circumstances, has power to order

a receiver to sell property free and clear of all [e]ncumbrances and to deny the mortgagee the right to foreclose his mortgage."); Miner's Bank of Wilkes-Barre v. Acker, 66 F.2d 850, 853 (3d Cir. 1933) (same). Federal courts overseeing receiverships have repeatedly reaffirmed this principle. See, e.g., SEC v. Capital Cove Bancorp LLC, 2015 WL 9701154, at *4 (C.D. Cal. Oct. 13, 2015) ("[A] federal court presiding over a receivership may authorize the assets of the receivership to be sold free and clear of liens and related claims.") (internal quotation marks and citation omitted); Regions Bank v. Egyptian Concrete Co., 2009 WL 4431133, at *7 (E.D. Mo. Dec. 1, 2009).

Free-and-clear sales of receivership assets that will not satisfy debts to secured creditors are *generally* disfavored because creditors may sometimes achieve more significant recoveries through their own foreclosure efforts. There is no outright ban on the practice, however, which would deprive courts of the flexibility essential to administering a receivership estate. Accordingly, whether to allow such sales usually turns on the facts of the case. See Spreckels v. Spreckels Sugar Corp., 79 F.2d 332, 334 (2d Cir. 1935) (Hand, J.) ("We have no doubt that the power exists; the question is only as to the propriety of, and the proper conditions upon, its exercise. It is quite true, although there is perhaps no rigid rule about it, that ordinarily a court will not sell property free of liens unless it can see that there is a substantial equity to be preserved."); see also Capital Cove, 2015 WL 9701154, at *4; Regions Bank, 2009 WL 4431133, at *7 (citing Mellen v. Moline Malleable Iron Works, 131 U.S. 352, 357 (1889) ("[I]t has long been recognized that under appropriate circumstances, a federal court presiding over a receivership may authorize the assets of the receivership to be sold free and clear of liens and related claims.".)

It is essential for Mr. Hangley to have the authority to sell Fleetway's assets free and clear of all liens if he is to maximize the Banks' value. Moreover, a single decisionmaker with a fiduciary obligation to each lender offers the Banks the best chance of significant recoveries. The collateral at issue (Fleetway's leased vehicles) will depreciate if it remains on the company's

books.  See 2 Ralph E. Clark, A Treatise on the Law and Practice of Receivers § 500(c) (3d ed. 1992) ("Clark on Receivers") ("It . . . follows that courts of equity may and do in certain emergencies dispose of perishable personal property and at times property which is not strictly perishable in order to avoid great loss and depreciation.").  Mr. Cardone—whom Santander suggests should be Fleetway's receiver—has explained that many of the vehicles securing the loans to Fleetway "depreciate in value continually" because they are in use.  (Cardone Sept. Decl, ¶ 11.) Leaving Mr. Hangley without the authority to sell these cars quickly would thus impair his ability to "preserve the property of [the] litigants."  1 Clark on Receivers § 151.  Moreover, five separate efforts to liquidate Fleetway's many pledged assets would undoubtedly lack the "orderly and efficient administration of" the Company that the Receiver has implemented.  Hardy, 803 F.2d at 1038.

Santander suggests a receiver may not sell "a secured creditor's collateral free of its security interest" unless the sale "will probably produce a surplus for the receivership estate." (Doc. No. 302, at 19 (citing, inter alia, 28 U.S.C. § 959(b).)  Santander thus argues that because the value "of the leased vehicles securing Santander's loan" (and, indeed, all the secured loans) is less than Fleetway's debt, § 959(b) bars sale of its collateral.  This is certainly incorrect.

Section 959 provides that in administering the estate, a receiver "shall manage and operate the property in his possession as [receiver] according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof."  29 U.S.C. § 959(b).  Misapplying this statute, Santander argues that Pennsylvania's "valid law"—its Uniform Commercial Code—precludes the Receiver from selling collateral free and clear of liens.

Section 959(b) does not speak to distribution, however.  Rather, it instructs receivers to follow valid state laws when they "manage" and "operate" receivership property.  The Third

Circuit has thus explained that § 959(b) requires receivers to abide by state regulations concerning "public health, safety, or welfare." Matter of Quanta Resources Corp., 739 F.2d 912, 919–20 (3d Cir. 1984). Indeed, the Quanta Court expressly rejected the suggestion that § 959(b) applies to distribution of funds: "[c]learly state law regulating the distribution of assets among creditors must give way to the all-encompassing federal law of creditors' rights." Id. (citing Am. Surety Co. v. Sampsell, 327 U.S. 269, 272 (1946)). Were it otherwise, creditors could frustrate federal bankruptcy restrictions by demanding distributions owed under state laws. See Am. Surety Co., 327 U.S. at 272. Obviously, this is not permissible.

Similarly, Santander relies on holdings that contradict its own contentions. (See Doc. No. 312, at 31 (citing Spreckels v. Spreckels Sugar Corp., 79 F.2d 332, 334 (2d Cir. 1935); id. (citing Seaboard Nat'l Bank v. Rogers Milk Prod. Co., 21 F.2d 414, 416 (2d Cir. 1927).) Courts have repeatedly ruled that whether to authorize free-and-clear sales that will not generate a surplus is a matter of the district court's equitable discretion. See, e.g., People's-Pittsburgh Trust Co., 65 F.2d at 972 ("The question for the court to determine in any particular case is whether or not the circumstances are such in that case as justify it in denying the mortgagee the right to foreclose his mortgage and in ordering the receiver to sell the property free and clear of the lien thereon."). Once again, the facts I have found underscore that Mr. Hangley must have the authority to sell Fleetway's assets free and clear of all liens in the absence of a surplus.

### The Secured Creditors Will Pay the Receivership's Costs

I have the discretion to decide "who will pay the costs of the [R]eceiver." Elliott, 953 F.2d at 1576. I will allow the Receiver to charge his costs against the funds he has recovered. In reaching this decision I am guided by the unremarkable principle that "it is but right and fair that" those who benefit from the Receiver's activities "should be required to pay [their] burden of the costs, including allowances to the [R]eceiver." 2 Clark on Receivers § 638.

Once again, Santander alone objects.  Yet, as of July 2019, the Receiver had distributed over $2.2 million to Santander.  (Receiver's Twelfth Report, at 18–19.)   These funds did not fall from the sky and were not recovered by Santander: Mr. Hangley recovered them by managing Fleetway's performing leases, pursuing delinquent customers, and selling vehicles (over many of which he had to regain control).  Pursuant to my Order, the Receiver has "expend[ed] a reasonable amount of money for absolutely necessary preservation of the property."  2 Clark on Receivers § 638.  The resulting Receivership costs must be borne by Santander and the other Banks, all of which Mr. Hangley has benefited.  See, e.g., id.

Santander also contends I may not confer on the Receiver powers that could "impair the value" of the Bank's collateral or "subordinate" its rights.  (Doc. No. 302, at 16–17.)   The supporting authority Santander cites again belies its argument.  The Clark treatise cautions that courts generally lack the power to charge lienholders for expenses associated with "improving or making additions to the property or carrying on the business of the defendant at the expense of prior mortgagees or lienholders without the sanction of such mortgagees or lienholders."  2 Clark on Receivers § 638.  Yet, Mr. Hangley has taken no such actions.  (See, e.g., Receiver's Twelfth Report (showing Fleetway's assets have reduced from $26,225,081 to $9,021,755 during the Receivership).)   In apposite part, Clark advises that lienholders may be charged for reasonable expenses "absolutely necessary [for] preservation of the property."  2 Clark on Receivers § 638. That is precisely the situation here.

Santander also argues that § 959(b) prohibits the Receiver from using its "collateral in contravention of the secured creditor's rights under its security agreement."  (Doc. No. 302, at 18.) As I have discussed, the statute is inapplicable.

Mr. Hangley may thus charge Receivership expenses against the collateral of all the Banks, including Santander.

## VI.    CONCLUSION

When I appointed Mr. Hangley, Fleetway was swimming in debt, self-dealing, and creditor litigation.  In fifteen months, he has transformed the Company: it is well managed, its Secured Creditors are receiving millions of dollars from asset sales, and self-dealing is at an end, as is pointless, expensive litigation among the Banks.  That is certainly why four of Fleetway's secured creditors do not object to Mr. Hangley's reappointment.  Indeed, even the Stamps family has applauded Mr. Hangley's efforts.  Santander's unending efforts to challenge and obstruct the Receivership are without basis in law, border on the irrational, and have caused considerable, unnecessary expense.  How that expense is apportioned will be addressed in due course.  For the present, I will reappoint Mr. Hangley so that he may complete his efforts.

An appropriate Order follows.

**AND IT IS SO ORDERED.**

*/s/ Paul S. Diamond*
_____
Paul S. Diamond, J.